**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(CIVIL DIVISION)**

| | |
|---|---|
| GRUNLEY CONSTRUCTION COMPANY, INC.,<br>15020 Shady Grove Road, Suite 500<br>Rockville, MD 20850<br><br>     Plaintiff,<br><br>        v.<br><br>WESTERN SURETY COMPANY,<br>101 S. Phillips Avenue<br>Sioux Falls, SD 57104<br><br><u>SERVE ON REGISTERED AGENT</u>:<br>CT Corporation System<br>1015 15th Street, NW, Suite 1000<br>Washington, DC 20005<br><br>and<br><br>CNA SURETY CORPORATION,<br>333 S. Wabash Avenue, 41st Floor<br>Chicago, IL 60604<br><br><u>SERVE ON REGISTERED AGENT</u>:<br>CT Corporation System<br>208 S. LaSalle Street, Suite 814<br>Chicago, IL 60604<br><br>     Defendants. | Civil Action No. 1:16-cv-1127 |

## COMPLAINT

Grunley Construction Company, Inc. ("Grunley"), by counsel, for its Complaint against

Defendants Western Surety Company ("WSC") and CNA Surety Corporation ("CNA"), hereby

states as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of a performance bond brought by Grunley against WSC and CNA arising out of underlying breaches of a subcontract committed by PDM Contracting Services, Inc. ("PDM"), the principal of WSC and CNA.

## PARTIES

2.      Grunley is a construction company incorporated in Maryland with its principal office in Rockville, Maryland.

3.      On information and belief, WSC is a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business located in the State of South Dakota.

4.      On information and belief, CNA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of Illinois.

5.      On information and belief, CNA is the parent corporation or other similar affiliate company of WSC.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest, fees, and costs.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391, in that Grunley does business in this judicial district, and a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTUAL ALLEGATIONS

8.      In 2012, Grunley entered into a prime contract (the "Prime Contract") with Euro Capital Properties, LLC ("Owner") to conduct renovations on the Watergate Hotel, which is located at 2650 Virginia Avenue, N.W., Washington, D.C. 20037 (the "Project").

9.      On or about July 27, 2015, Grunley and PDM entered into a written subcontract (the "Subcontract"), whereby PDM agreed, among other things, to provide "Guestroom Millwork Installation" work on the Project.  The original price of the Subcontract was $334,225.00.  A true and correct copy of the Subcontract is attached hereto as Exhibit A.

10.     On or about August 21, 2015, WSC, as surety, issued a Performance Bond, No. 71692440, on behalf of PDM, as principal, and in favor of Grunley, as obligee (the "Performance Bond").  A true and correct copy of the Performance Bond is attached hereto as Exhibit B.  In the Performance Bond, WSC guaranteed the performance of its principal, PDM, under the Subcontract, and agreed:

> Whenever [PDM] shall be, and be declared by [Grunley] to be in default under the Subcontract, [Grunley] having performed [its] obligations thereunder:
>
> (1)     [WSC] may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
>
> (2)     [Grunley] after reasonable notice to [WSC], or [WSC] upon demand of [Grunley] may arrange for the performance of [PDM's] obligation under the subcontract subject to the provisions of paragraph 3 herein;
>
> (3)     The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by [Grunley], and the reasonable cost exceeds the balance of the subcontract price.  [WSC] shall pay to [Grunley] such excess, but in no event shall the aggregate liability of [WSC] exceed the amount of this bond. . . . The term "balance of the subcontract price," as used in this paragraph, shall mean the total amount payable by [Grunley] to [PDM] under the subcontract and any amendments thereto, less the amounts heretofore properly paid by [Grunley] under the subcontract.

(Exhibit B, Performance Bond.)

3

11.     The terms of the Subcontract are expressly incorporated into the Performance Bond by reference.

12.     Under the express terms of the Subcontract, PDM covenanted and agreed to diligently and continuously prosecute and complete the work required by the Subcontract. Specifically, Article 25 of the Subcontract provides, in pertinent part: "The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the Work in a diligent and expeditious manner."  (Exhibit A, Subcontract, Article 25.)   Additionally, Article 10 of the Subcontract provides as follows:

> Time is of the essence with respect to the Subcontractor's performance of the work and Subcontractor's compliance with the terms and conditions of the Subcontract. The Contractor has the right to direct the manner in which the Subcontractor performs its work.  Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary.  If overtime or additional shifts are required solely to accelerate project completion through no fault of the Subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor.  Payments due may be withheld to insure timely progress and completion of work.  The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages and legal fees) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

(Exhibit A, Subcontract, Article 10.)

13.     Under the express terms of the Subcontract (which are incorporated by reference into the Performance Bond), PDM covenanted and agreed that Grunley would be entitled to take certain steps to ensure that defective work under the Subcontract would be corrected.  In this regard, Article 15 of the Subcontract provides, in relevant part:

4

Rejection by Contractor of any or all parts of defective work for failure to conform with the Subcontract shall be final and binding. Such rejected work shall promptly be corrected or replaced by Subcontractor at Subcontractor's expense. If Subcontractor fails to commence and diligently continue correction or replacement of such rejected work within forty-eight (48) hours, after receipt of written notice from Contractor to correct or replace the rejected work, Contractor may at its option remove and replace the rejected work and Subcontractor shall promptly reimburse Contractor for the costs of such removal and replacement of defective work.

(Exhibit A, Subcontract, Article 15.)

14.     Under the express terms of the Subcontract (which are incorporated by reference into the Performance Bond), PDM covenanted and agreed that Grunley would be entitled to take certain steps to ensure the completion of the Subcontract work in the event of a default by PDM with respect to its obligations under the Subcontract and upon three (3) days notice of such default by Grunley. In this regard, Article 14 of the Subcontract provides in part:

The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: failure to expeditiously prosecute and complete the whole or any part of the Work in accordance with the current Schedule of Progress and/or directions from the Contractor; failure to pay for labor and material, payroll taxes, contributions, or insurance premiums; interference with the performance of work by others for any reason; an act of bankruptcy or insolvency; or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities. If the Subcontractor breaches the Subcontract, Contractor shall have the right, after three (3) days written notice to the Subcontractor, in addition to any other rights and remedies provided by this Agreement, the other Contract Documents or by law: (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances, and other items thereon, all of which the Subcontractor hereby transfers, assigns, and sets over to Contractor for such purpose, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefore. In the event that the Contractor believes in good faith that the work is being endangered by the Subcontractor's failure to prosecute the work or take action, such written notice may be omitted and the Contractor may immediately take the actions set forth in this Article 14.

5

In case of termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work is completed to the satisfaction of Contractor and the Owner.  If the unpaid balance of the amount to be paid under this Agreement exceeds the cost and expense incurred by Contractor in completing the Work, such excess shall be paid by Contractor to the Subcontractor; but if the cost and expense to complete the Work exceeds the unpaid balance, then the Subcontractor and its surety shall pay the difference to Contractor.  Such cost and expense shall include: i) the cost of performing and furnishing all labor, services, materials, equipment, and other items required to complete the Work to the satisfaction of Contractor and the Architect, ii) all losses, damages, costs, and expenses (including legal fees and disbursements incurred in connection with reprocurement, in defending claims arising from such default and in seeking recovery of all such cost and expense from the Subcontractor and/or its surety), and iii) all liquidated damages and other disbursements sustained, incurred, or suffered by reason of or resulting from the Subcontractor's default. Contractor does not waive any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor.  If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 29, Termination for Convenience.

(Exhibit A, Subcontract, Article 14.)

15.    Throughout work on the Project, serious problems with PDM's performance under the Subcontract surfaced.  For instance, it was necessary for Grunley to supplement PDM by hiring additional subcontractors and also by using Grunley's own labor and material to fulfill PDM's contract work.

16.    By letter dated December 11, 2015, Grunley sent to PDM, with copy to WSC, a Failure to Perform – Notice to Cure letter, stating in pertinent part:

This letter shall serve as Grunley Construction Company, Inc. (Grunley) written notification to PDM Contracting Services, Inc. that your Company has failed to provide the proper resources as necessary to service this Project and therefore is in default of its Subcontract.  As you are aware, and per your email dated December 11, 2015, half of your crew walked off the project as a result of non-payment from your firm.

Therefore, in accordance with Article 14 – Default Termination, this notification shall serve as PDM Contracting Services, Inc. seventy-two (72) hour Notice to Cure.  Specifically, PDM must do the following in order to cure this default:

5/50295.1

1.      Complete installation of FCU Covers on floors 11 and 12 by close of business Friday, December 11, 2015.  This excludes units xx22 and xx24.

2.      Complete Valence installation from 14th floor to 8th floor by close of business Tuesday, December 15, 2015.

3.      Immediately increase manpower back to a minimum of 40 workers per day.

If these items are not cured or PDM does not commence to cure these items during this period, Grunley reserves the right to take all measures as allowed by our Subcontract Agreement to complete this scope of work and deduct these costs and any other damages resulting from this default from your subcontract accordingly.

17.      By letter dated December 24, 2015, Grunley sent to PDM, with copy to WSC, a

Failure to Perform – Notice to Cure letter, stating in pertinent part:

In accordance with our previous letter dated December 11, 2015, PDM Contracting Services, Inc. continues to fail to provide the proper resources as necessary to service this Project and remains in default.  PDM has and continues to miss key completion dates for the project.

Additionally, we have been notified by several of your employees that PDM failed to make payment for their services and they have walked off the project.  Be advised that this is a direct breach of both Article 10 – Time is of the Essence and Article 14 – Default Termination.

Given the above and in accordance with Article 14 – Default Termination, Grunley Construction will immediately begin supplementing PDM's forces.  We request a plan of action by PDM for how they plan to finish this project by no later than Monday, December 18, 2015 and provide sufficient manpower to meet the completion dates.

18.      By letter dated January 4, 2016, Grunley sent to PDM, with copy to WSC, a Failure

to Cure letter, stating in pertinent part:

Pursuant to our letters of December 11, 2015 and December 24, 2015, notifying PDM Contracting Services of their continuing default on this project, PDM has failed to cure their default in the 72 hours allotted.  Additionally, PDM has once again failed to live up to its contractual obligations and agreements per our meeting on December 31, 2015 (see attached email).  The millwork on the 11th and 12th floor remains incomplete (see attached photos of incomplete work).

7

As a direct result of PDM Contracting's default, and failure to cure this default, Grunley shall proceed at its sole discretion with certain remedies stated in the Subcontract, which include, but are not limited to, supplementing of PDM's workforce, supplementing PDM's supervision on site, and procurement of material and fabrication.  Grunley hereby reserves all of its rights and remedies under the Subcontract, including the right to terminate PDM for default, and under applicable law.  As of the date of this letter, Grunley is proceeding with the supplementing PDM's workforce, supervision and material procurement.

In closing, we are willing to allow PDM to continue to perform work on this project but are not in a position to allow the delays in completion of your work to continue.

19.     By letter dated January 6, 2016, Grunley sent to PDM, with copy to WSC, a supplemental default notice, stating in pertinent part:

Pursuant to our letter of January 4, 2016, notifying PDM Contracting Services of their failure to cure, we have entered into a Subcontract Agreement with another firm to complete the remaining millwork on floors 2 through 8 for a lump sum amount of $445,000.  PDM will be responsible for all additional costs associated with this supplementation and any other damages over and above.  Accordingly, PDM shall cease and desist with all work on floors 2 through 8, and no workers from PDM will be allowed on these floors.

In addition, please be advised that PDM remains responsible to complete all work associated with floors 9 through 14.  As you are aware, this work is substantially late and may require supplementation as well if PDM continues to fall behind schedule.  Below please find a list of dates that are required to be met or we will supplement your forces:

. . .

Finally, given the critical nature of this work, we request PDM immediately provide Grunley a plan of action, including but not limited to manpower and duration per area, of how they intend to meet the dates above.

20.     By letter dated January 17, 2016, Grunley sent to PDM, with copy to WSC and CNA, a Failure to Perform letter, stating in pertinent part:

PDM is in continuing default of its Subcontract Agreement by failing to "expeditiously prosecute and complete the whole or any part of the Work in accordance with the current Schedule of Progress and/or directions from the Contractor" in accordance with Article 14 – Default Termination.

On December 31, 2015 PDM committed to providing Grunley Construction a QC review for the 12th Floor millwork by end of day January 3, 2016, including a list of work items performed by room, signed and dated by PDM management personnel. In addition to this commitment, punchlists have been available for rooms on the 12th Floor as early as January 8, 2015. To date, Grunley has not received documentation of completed QC or punchlist work from PDM, despite numerous requests for the same.

As you are aware, PDM's labor forces have been supplemented at Floors 8 – 2, due to its inability to "proceed with . . . the work . . . as required by the Schedule of Progress." Subsequent to PDM's partial termination, Grunley believes the work schedule on floors 9 to 14 "is being endangered by the Subcontractor's failure to prosecute the work." Grunley will take immediate action to limit PDM's impact by supplementing its labor forces with punchlist crews on the 11th and 12th floors starting Monday January 18, 2016 in accordance with Article 14. PDM is hereby directed to focus its insufficient manpower to the 12th floor punchlist effective immediately. Grunley reserves any and all claims, rights or remedies available to it, including rights of setoff and collection of any funds which may be due PDM under other subcontracts with Grunley for damages related to this matter.

21.     By separate letter dated January 17, 2016, Grunley sent to PDM, with copy to WSC

and CNA, a Failure of Payment letter, stating in pertinent part:

In accordance with Article 14 – Default Termination, PDM is in continuing default of its Subcontract Agreement by failing to "pay for labor and material, payroll taxes, contributions . . ." for services related to the Watergate Hotel Renovation Project.

On January 15, 2016 Grunley Construction received the attached written correspondence from CCS Construction Staffing regarding PDM's lack of payment for services from November and December of 2015. Further on January 15, 2016 a claimed former employee of PDM, Alvin Jack, came to Grunley for help regarding lack of payment for labor provided through December 30, 2015. He claims 3-4 other persons are similarly without payment.

These actions are a breach of the subcontract agreement and if PDM does not cure this default by January 20, 2016, Grunley may have no choice but to exercise its right within Article 14 to terminate PDM's subcontract agreement. Grunley reserves any and all claims, rights or remedies available to it, including rights of setoff and collection of any funds which may be due PDM under other subcontracts with Grunley for damages related to this matter.

22.     Despite the multitude of notices issued by Grunley to PDM, PDM did not cure its

deficient and/or untimely performance. Likewise, despite these notices, upon which WSC and/or

CNA were copied, WSC and CNA did not respond either to cure PDM's breaches of the Subcontract or to reimburse Grunley for its damages, *i.e.*, the difference between PDM's subcontract balance and the total cost expended by Grunley to complete or correct PDM's work, payments to PDM's subcontractors or suppliers, and other default related damages.

23.     To date, PDM has failed to honor its obligations under the Subcontract and WSC and CNA have failed to honor their obligations under the Performance Bond, including those obligations expressly imposed on WSC and CNA by the Subcontract, which the Performance Bond incorporates by reference.

24.     As a result of WSC's and CNA's (and PDM's) default, Grunley has incurred and will continue to incur damages, including completion, administrative, overhead, and other costs, interest, and attorneys' fees.

25.     Grunley has performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from its performance obligations because of PDM's breaches of its obligations to Grunley and/or WSC's and CNA's breaches of their obligations to Grunley.

26.     This action is being brought within two years from the date of substantial completion of the Project, as required by the Performance Bond.

<u>**COUNT I**</u>
**(Breach of Performance Bond)**

27.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

28.     WSC and CNA issued a Performance Bond whereby WSC and CNA agreed, among other things, to pay Grunley, as obligee, all amounts owed to Grunley by reason of PDM's default

under the Subcontract, up to $334,225.00.  WSC, CNA, and PDM are jointly and severally liable under the Performance Bond.

29.    WSC and CNA were informed timely of PDM's default under the Subcontract and failed or refused to cure the default.

30.    WSC and CNA have failed to perform their obligations under the Performance Bond.

31.    WSC's and CNA's failure to perform their obligations under the Performance Bond constitutes a breach of contract.

32.    WSC's and CNA's failure and refusal to perform their obligations under the Performance Bond constitutes a breach of their duty of good faith and fair dealing.

33.    Grunley performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from performance because of PDM's breach of its obligations to Grunley and/or WSC's and CNA's breaches of their obligations to Grunley.

34.    As a result of WSC's and CNA's breaches, Grunley has suffered, and will suffer, substantial damages, in excess of $800,000.00.

35.    WSC, CNA, and PDM and jointly and severally liable to Grunley for the damages incurred.

36.    Grunley is entitled to an award of interest, costs, and attorneys' fees against WSC and CNA.

**WHEREFORE**, Grunley demands judgment in its favor and against WSC and CNA in an amount in excess of $800,000.00, as well as all other damages, costs, and expenses, including attorneys' fees, incurred by Grunley as a result of Defendants' failure to perform and other breaches, and for such further and different relief as the Court deems just and proper.

Dated: June 15, 2016                                   Respectfully submitted,

                                   */s/ Robert J. Symon*
                                   Robert J. Symon, Esq. (Bar No. 436245)
                                   Eric A. Frechtel, Esq. (Bar No. 476967)
                                   Amy E. Garber, Esq. (Bar No. 498404)
                                   BRADLEY ARANT BOULT CUMMINGS LLP
                                   1615 L Street, N.W., Suite 1350
                                   Washington, DC 20036
                                   Telephone:     (202) 393-7150
                                   Facsimile:     (202) 347-1684
                                   Email:         rsymon@babc.com
                                                  efrechtel@babc.com
                                                  agarber@babc.com

                                   *Counsel for Plaintiff*
                                   *Grunley Construction Company, Inc.*

5/50295.1